UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
DANIELLE STEWART,

                            Plaintiff,                    Case No.:   20-cv-1965

       -against-

                                                       **COMPLAINT**
                                                       **Plaintiff Demands a Trial by Jury**

SEAFIELD SERVICES, INC.,

                            Defendant.
---------------------------------------------------------X

       Plaintiff Danielle Stewart, by her attorneys, for her Complaint herein, respectfully alleges:

### The Parties

       1.       Plaintiff Danielle Stewart is a disabled individual. This case challenges the unlawful discrimination, hostile work environment and retaliation perpetrated by the defendants due to Plaintiff's disability. This action seeks damages for disability discrimination, hostile work environment and retaliation under 42 U.S.C §12101 et seq., Americans With Disabilities Act of 1990 ("ADA"), New York Executive Law §290 et seq. ("NYSHRL"), and the Family Medical Leave Act ("FMLA").  Plaintiff was treated differently than her similarly situated, non-disabled co-workers. For years, Ms. Stewart endured discriminatory behavior by the officers and managers of the corporate defendant because of her disability until she was terminated for pretextual reasons after she complained of discrimination and requested leave under the Family Medical Leave Act.

       2.       Ms. Stewart is a Licensed Master Social Worker and she was employed by Seafield as a Case Manager from April 2016 until November 2019.

       3.       Ms. Stewart suffers from Hereditary Spastic Quadriparesis which confines her to a wheelchair, an opthamologic condition (Ptosis), which causes her eyelids to droop, and chronic

respiratory failure which requires Ms. Stewart to use a ventilator.

4. Despite these medical conditions, Ms. Stewart was and is able to perform all of the job duties required for her position and proved herself a hardworking, capable and loyal employee

5. Plaintiff seeks lost past and future wages, compensatory damages, including damages for emotional distress, mental anguish and humiliation, costs and attorneys' fees, punitive damages and all other appropriate equitable and legal relief.

6. Defendant Seafield Services, Inc. ("Seafield") operates substance abuse treatment facilities, including an in-patient facility at 7 Seafield Lane Westhampton Beach, NY 11978 and out-patient facilities in other locations throughout Long Island.

## Jurisdiction and Venue

7. The jurisdiction of the Court over this controversy is based upon 28 U.S.C. § 1331, as this matter is raised under 42 U.S.C. §12101 et seq.

8. The Court also has supplemental jurisdiction over this case pursuant to 28 U.S.C. § 1367 (a), as Plaintiff's NYSHRL claims form part of the same case and controversy. Venue is proper because the events alleged in this complaint occurred in this District.

9. Plaintiff filed a charge with the EEOC against Defendants on January 23, 2020 complaining of discrimination on the basis of her disability as alleged in this complaint.

10. On or around February 4, 2020, the EEOC issued a right to sue letter against the Defendant (attached hereto as Exhibit "A").

## Factual Allegations

11. Ms. Stewart was hired by Seafield on April 11, 2016 to work as a Case Manager at Seafield's outpatient facility in Medford, NY.

12. Ms. Stewart's duties included counseling patients in individual and group settings.

13. On September 26, 2016 Corporate Director Anita Young, who provided clinical supervision to Social Workers at the Seafield Medford location, asked Plaintiff why she does not maintain good eye contact.

14. Plaintiff informed both Anita Young and Executive Director Gladys Knowles that she has an ophthalmologic condition which causes her eyes to appear as if they are closing and not focusing due to weak muscles. Right after that conversation, Ms. Young held a group supervision session to explain the importance of maintaining appropriate eye contact, all while focusing on Plaintiff's "inappropriate eye contact" (while aware of her condition). Ms. Young's discussion with Plaintiff on appropriate eye contact was then written up as a "supervision note".

15. On two occasions in 2016, including May 2016 Plaintiff requested to leave the office for a doctor's appointment, as she was feeling ill. Plaintiff was not permitted to leave on her own, and was instead forced to take an ambulance against her will. Plaintiff was informed that if she left the premises without taking an ambulance, she would be terminated. Other Seafield employees were not forced to take an ambulance when they left the office for a doctor's appointment.

16. In December, 2017, after a group supervision session, Anita Young forced Plaintiff to stay behind to "memorize the names of the Christmas reindeer." Ms. Young stated that, "Even Jews should know the name of the reindeer!". Plaintiff is Jewish.

17. In January, 2018 Plaintiff received an employee review from her supervisor, Ellen Lynch, who noted that Plaintiff needs to work more on her eye contact.

18. Plaintiff reminded Ms. Lynch that she has a visual disability, and Ms. Lynch responded, "I know, I was told to put in a statement about your eye contact by Gladys Knowles and by Anita Young."

19. On that same date, Plaintiff met with Gladys Knowles, and offered to provide a letter from her physician explaining her visual disability. Ms. Knowles denied wanting documentation about Plaintiff's disability.

20. In the Spring of 2018 Plaintiff requested a transfer to Seafield's Amityville, NY location to Seafield Services in Amityville due to the ongoing hostile behavior of her clinical supervisor, Anita Young. Plaintiff's request for a transfer was approved around August, 2018. However, the hostility and bullying towards Plaintiff due to her disability increased significantly after Plaintiff moved to Seafield's Amityville location.

21. Before accepting the transfer, Plaintiff requested a tour the Amityville building to ensure that it was handicap accessible and was advised by Gladys Knowles and Anita Young that she could not do so. Plaintiff was informed that "the building has an elevator." Plaintiff trusted her supervisors, accepted the transfer and began working at Amityville in September 2008.

22. During the first week of Plaintiff's employment at Amityville in September, 2018 Plaintiff notified Seafield's Director of Human Resources Lisa Zahralban and the Executive Director of Seafield Services in Amityville, Fran Valentino, that there were accessibility issues with the Amityville location.

23. Plaintiff specifically informed Seafield's Human Resources department of the following:

    i. Plaintiff could not fit her wheelchair into the bathroom stall;

    ii. It was extremely difficult for Plaintiff to roll her wheelchair up the curb to the building and into the door of the building due to the angles of the curb;

    iii. Fran Valentino refused to keep the double glass doors at the entrance to the office open so Plaintiff could not fit her wheelchair into or out of the building when entering or exiting for the day. Plaintiff was humiliated by having to constantly ask colleagues or patients to unlock the closed door so that Plaintiff could enter and exit the building;

    iii. Plaintiff was unable to fit her wheelchair through a doorway into a room that she would need to use daily, and therefore required assistance multiple times a day in order to complete her work;

    iv. Plaintiff's wheelchair was repeatedly getting stuck in the gap of the elevator.

24. Plaintiff was informed that she could transfer back to the Medford location, but that she would have to work a different shift.

25. Plaintiff asked how it was fair that she was not permitted to tour the Amityville location prior to transferring (and was told it was accessible, when it was not) and also informed that she could not have her shift back at the old location. Plaintiff did not receive an answer or explanation.

26. Because Plaintiff was not allowed to return to her previous shift at the Medford location, she stayed at the Amityville location.

27. It was several months before Seafield did eventually modify the restroom so that Plaintiff could fit in a stall and provided Plaintiff with a printer so that she did not have to worry about fitting into the inaccessible room simply to print documents.

28. Although Seafield improved accessibility through the front entrance approximately nine months after Plaintiff began working at Amityville, Seafield never fixed the inaccessible curb or the elevator gap.

29. On October 3, 2018 Plaintiff's wheelchair flipped out of the elevator due to the caster wheel getting stuck in the gap. Office Manager Daniel Parisi stated on this date, "Oh yeah, that elevator is really old and dangerous."

30. Plaintiff took an Uber to the emergency room, and was diagnosed with a concussion and back injury. Plaintiff took off of work on October 4, 2018 due to pain.

31. On October 5, 2018 Plaintiff provided Fran Valentino, with a clearance letter to return to work from her physician. Ms. Valentino informed Plaintiff that she must now have an escort at all times when using the elevator.

32. On October 10, 2018 Plaintiff's colleagues Laura Dermody and Tanya Coleman refused to assist her in the elevator, stating that it's "too dangerous."

33. On October 11, 2018 Plaintiff was unable to print documents in the printer room and did not have any assistance to do so, as her wheelchair did not fit into the printer room. Plaintiff was later reprimanded by Fran Valentino for "taking too long" to complete a patient assessment when Plaintiff was trying to complete the task without having access to the printer room.

34. On October 25, 2018 Seafield's Director of Human Resources, Lisa Zahralban, informed Plaintiff that: "You do not require someone to assist you in and out of the elevator. I was told that it was fixed after you fell." Plaintiff informed her that the gap was still present.

35. On that same date, Plaintiff showed Fran Valentino a medical cell phone which Plaintiff uses to give herself medication through an implanted pump. Plaintiff also showed Ms. Valentino an internet article about her Patient Therapy Manager ("PTM") for her pain pump, which Ms. Valentino acknowledged. Plaintiff informed Ms. Valentino that she uses the device 4-5 per day, for approximately 2-3 minutes.

36. Plaintiff showed the phone and article to Ms. Valentino because Ms. Valentino had accused Plaintiff of using her personal phone while in her office, when in fact she was giving herself medication by using this device. Even after explaining this to Ms. Valentino, Plaintiff was regularly harassed about the use of her cell phone during work hours.

37. On numerous occasions over the next several months Plaintiff required assistance from co-workers after her wheelchair got stuck in the elevator. This was witnessed by the office manager and well as a supervisor, Carol McKinney. Plaintiff had to ask for assistance from a co-worker several times each week when she was leaving the office in the evenings.

38. Plaintiff informed Fran Valentino that the gap was still present and that the elevator was now emitting a screeching sound while in motion. Ms. Valentino stated, "That f-cking elevator will never be fixed… they just need to put in a new one because it's been broken forever."

39. The elevator gap was never fixed and Plaintiff continued to get stuck when entering and exiting the elevator. Plaintiff was regularly humiliated by having to ask her co-workers or patients to help her out of the elevator.

40. On or around May 14, 2019, Plaintiff was informed, without explanation that she would not be permitted to continue providing regular group or individual therapy and that she was to train another case worker to take over her groups. From that time on, Plaintiff lost her regular case load and was relegated to "desk duty" reviewing documentation from other case workers. Other similarly situated Seafield employees did not have their caseloads taken away without explanation.

41. On September 11, 2019 Fran Valentino sent Plaintiff an e-mail stating: "As the Executive Director and Meghan being your director supervisor our request that we explore how you are going to address the patients with regards to your machine (ventilator) on several occasions is to help you become more comfortable to address it with patients so that there is less requests for a new counselor." Plaintiff responded in a follow-up e-mail: " I do not feel that there is a need to further explore/no need to explore how I am going to address patients in regards to my using a ventilator, as I have expressed that I am comfortable explaining my need for it to patients. To my knowledge, I have not been informed that any patients have asked for a change in clinicians due to my using a ventilator."

42. On September 12, 2019 Fran Valentino informed Plaintiff that her office was being moved down the hall. Plaintiff informed Ms. Valentino that this would present difficulty for her, as her current office was right next to the door to enter/exit to use the rest room, and right

8

next to the scanner, printer, and mail room. Plaintiff informed Ms. Valentino that it is difficult to use her wheelchair on carpet, and that this would lead to increased shoulder pain.

43. On September 18, 2019 Plaintiff sent an e-mail to Fran Valentino and to Lisa Zahralban, informing them that changing Plaintiff's office would create difficulties. Plaintiff requested that she be allowed to remain in her current office as an accommodation for her disabilities. Plaintiff also expressed her discomfort with Ms. Valentino's repeated accusations that Plaintiff was "falling asleep" at work (which Plaintiff explained was incorrect but that it may have appeared that her eyes were squinting due to her visual disability), as well as accusations that Plaintiff was on the phone at times that she should not have been, when she was in fact using her medical cell phone to administer medication.

44. Because of the continuing harassment and hostile environment Plaintiff contacted Director of Human Resources Lisa Zahralban, and requested a transfer back to the Medford location. Plaintiff informed Ms. Zahralban that she was consistently subject to bullying and hostility by Fran Valentino at the Amityville location due to her disability, and noted that she had been praised for her work at the Medford location. Ms. Zahralban told Plaintiff that she would "get back to her" about a transfer back to Medford.

45. On September 19, 2019 Lisa Zahralban advised Plaintiff that a transfer back to the Medford location would not be granted despite the fact that there was an open position for the same job title at the Medford location. Plaintiff knew this because a job posting had been circulated in an email that week to the office staff.

46. On September 25, 2019 Plaintiff informed Clinical Director Meghan Kaminowitz that she had dislocated her shoulder in the process of wheeling her wheelchair back and forth from the new office to the doors, which were now farther away from her office. Plaintiff informed her supervisors that this is a re-occurring injury which happens when she wheels her wheelchair over longer distances.

47. This occurred again later that week, and led to Autonomic Dysreflexia, which is a condition affecting individuals with paraplegia/quadriplegia when they are in pain but are physically unable to feel the pain. The condition causes dangerously high blood pressure Supervisor Carol McKinney witnessed Plaintiff take her blood pressure, which was at a critical level, and called for an ambulance. Plaintiff was taken to the hospital for treatment.

48. On October 9, 2019 Plaintiff was informed that she would be allowed to switch to a smaller office with a co-worker closer to the front of the building. At that point Plaintiff had already been compelled to order a new power wheelchair, so Plaintiff advised her supervisor that a room change would not be required because Seafield had done too little, too late. Plaintiff expressed her frustration she was forced to spend extra on expediting new wheelchair parts so that she could get around the office safely. Plaintiff also explained that the office she was offered was too small for two people and a wheelchair and that it had always been used by only one person.

49. On October 10, 2019 Plaintiff informed Fran Valentino and Meghan Kaminowitz that her ventilator was broken, and that it might make some sounds during a team meeting.

Plaintiff also informed Ms. Kaminowitz that she lost a contact lens and that she might be squinting more than usual so that she can see.

50. Plaintiff informed her supervisors of this due to past false accusations that she was falling asleep. Plaintiff had already explained numerous times that her droopy eyelids were due to her visual disability.

51. Plaintiff nevertheless received an e-mail and warning after the team meeting that "several colleagues and we heard you snoring and saw you falling asleep during team meeting." Plaintiff reminded both Ms. Valentino and Ms. Kaminowitz that she had informed them before the team meeting that her ventilator was broken, and offered to replicate the noise that her ventilator was making during team meeting (due to a crack in the tube). Plaintiff noted that she had been actively participating in team meeting, and informed them that it is physically impossible for Plaintiff to snore with this machine on. Plaintiff received a text message from Fran Valentino acknowledging that Plaintiff's ventilator was broken and permitting a repairperson to come to the office to repair it on October 11, 2019.

52. On October 17, 2019 Plaintiff responded to an e-mail from Fran Valentino, who yet again accused Plaintiff of being on the phone while at work. This was a repeated accusation throughout Plaintiff's time at the Amityville office. Ms. Valentino accused plaintiff of keeping her office door closed and not having transparency. On several occasions Ms. Valentino slammed Plaintiff's door open while Plaintiff was on a break and administering her medication and accused her of not sharing that she was on a break. This was humiliating to Plaintiff because Plaintiff has to lift her shirt to administer her medication.

53. The accusations became so pervasive that Plaintiff was forced to inform her supervisor each time she was administering her medication. This further humiliated Plaintiff. Other Seafield employees in Plaintiff's position were not required to inform their supervisors each time they were taking a break.

54. On October 28, 2019 Plaintiff's wheelchair again was stuck in the elevator and her co-workers assisted her with removing her chair from the gap in the elevator. In the process of removing the wheelchair from the gap in the elevator, Plaintiff's keys fell down the elevator shaft. Plaintiff was instructed by office manager to call the elevator company to retrieve the keys..

55. Plaintiff contacted the elevator company, and asked Daniel Parisi, Ms. Valentino, and Ms. Kaminowitz to alert her when the elevator repairperson arrives so that she could show them how her wheelchair gets stuck in the gap. Plaintiff was never given an opportunity to speak to the elevator repairperson and was instead handed her keys by Ms. Valentino who exclaimed, "These are a huge set of keys to have fallen down the gap in the elevator… that must be a f-cking big gap."

56. Seafield could have prevented any further incidents with Plaintiff's wheelchair getting stuck if they had asked the elevator company to repair the elevator on this date. Instead, they only had the repairperson retrieve Plaintiff's keys.

57. On November 1, 2019 Plaintiff received an e-mail from Lisa Zahralban stating that Seafield believed that Plaintiff was indeed snoring in a meeting (when her ventilator was

broken), further stating that: "Moreover, it is our understanding that while your ventilator may cover your nose, it does not cover your mouth, which produces the snoring sound."

58. Ms. Zahralban also claimed that Plaintiff had never previously informed anyone at Seafield that Plaintiff utilizes a cell phone to give herself medication. Plaintiff informed Ms. Zahralban that she had, indeed, shown Ms. Valentino the program that Plaintiff used to administer her medication. Ms. Zahralban also claimed that Plaintiff had "never previously informed anyone about having a visual disability" to which Plaintiff responded that she had spoken to all of her supervisors about this issue.

59. Ms. Zahralban e-mailed Plaintiff a copy of a request for a "Fitness for Duty" letter that she had mailed to Plaintiff's physician asking if Plaintiff's medication schedule (boluses) can be adjusted to be administered at the beginning of the day when she was not at work. Plaintiff did not give permission to Seafield to contact her physician and Ms. Zahralban had apparently obtained the physician's information from a previous "Fitness for Duty" letter from Plaintiff's physician. Plaintiff had previously provided Seafield with a "Fitness for Duty" letter, at Seafield's request, which Ms. Zahralban claimed "was not good enough, because it has to show how long you need to use your phone for each time you need to use it." Plaintiff informed her that each use is for approximately for 2 to 3 minutes to which she replied that Plaintiff still needed a new letter.

60. On November 6, 2019 Plaintiff provided Fran Valentino with medical documentation of her visual disability, which confirmed that Plaintiff has "systemic muscle weakness which causes abnormal eye movements." Upon receiving this documentation, Ms.

13

Valentino commented, "Well it's great that you have that, but we're accusing you of sleeping, not having a disability." Plaintiff also forwarded the documentation to Lisa Zahralban.

61.     On November 13, 2019 Plaintiff's wheelchair again became stuck in the gap of the elevator, and she flipped out of her wheelchair. Plaintiff reminded her supervisors that she had not yet heard back about the elevator being fixed after the repairman came to retrieve her keys but did not fix the gap.

62.     Plaintiff informed Fran Valentino and Meghan Kaminowitz that she had fallen, and she was seen by the facility nurse, Jennifer Marrs. Plaintiff informed her supervisors that she was experiencing Autonomic Dysreflexia, which is a condition affecting individuals with paraplegia/quadriplegia when they are in pain but are physically unable to feel the pain. The condition manifests itself by raising blood pressure to dangerously high levels. The nurse took Plaintiff's blood pressure and confirmed that she required medical attention.

63.     Plaintiff was transported by EMS to Huntington Hospital where she was diagnosed with a concussion and a deep tissue bruise on her back, and was advised to follow up with her physician the next day.

64.     On November 14, 2019 Plaintiff followed up with her physician, who advised Plaintiff to go to the emergency department due to symptoms that Plaintiff was experiencing which concerned her. Plaintiff returned to Seafield with a friend on the way to the hospital to pick up her car which she had left in the parking lot the previous day. Plaintiff saw Meghan Kaminowitz in the parking lot of Seafield and Plaintiff provided her with documentation from her physician stating that she was referring Plaintiff to the emergency room.

65. Plaintiff was admitted to Stony Brook University Hospital from November 15, 2019 through November 18, 2019. Plaintiff notified Fran Valentino and Lisa Zahralban that she was hospitalized due to the fall which occurred at the workplace.

66. On November 18, 2019 Plaintiff spoke to Lisa Zahralban and requested FMLA leave due to her injury. Plaintiff informed Ms. Zahralban that it was extremely difficult for her to get out of bed due to her injury, and that she was seeking medical care. Ms. Zahralban did not respond to Plaintiff's request. Plaintiff also contacted Ms. Zahralban on November 20, 2019 and left a message, but she did not receive a response.

67. On November 21, 2019 Plaintiff, while in bed trying to recover from her fall, received a call from Lisa Zahralban and Anita Young who informed Plaintiff that they have "evidence that you faked the death of a relative to cover an absence on October 26, 2019." Plaintiff was informed that she would be terminated if she could not immediately produce an original death certificate for her relative. Plaintiff reminded Ms. Zahralban that she had informed her four days prior, when she requested FMLA leave, that she was unable to get out of bed due to her injury.

68. Since Plaintiff was recovering from her fall and could not produce an original death certificate for her relative, she was terminated. Plaintiff received a phone call from Lisa Zahralban and Anita Young advising her that she was terminated for lying about her relative's death and for "poor performance", which they defined as "falling asleep, snoring, and excessive personal phone use".

69. Plaintiff also received a termination letter alleging that Plaintiff admitted to lying about the death of her relative. This was false. The letter also stated that Plaintiff refused to provide an original certificate of death, although Plaintiff had advised Ms. Zahralban during their conversation that she was unable to leave her house due to the injury that she had sustained at work. The termination letter also mentioned "ongoing performance issues".

70. Seafield was previously aware of Plaintiff's sick relative, as Plaintiff had discussed this relative with Fran Valentino and Meghan Kaminowitz on the first day of her employment at Amityville. Seafield was also aware during Plaintiff's employment that her relative has been in and out of the hospital. Moreover, Fran Valentino had met this relative at Plaintiff's mother's funeral in July, 2019, and commented to Plaintiff that this relative "does not look well". When Plaintiff returned to work the day after the funeral, Fran Valentino asked why she had not been invited to the funeral and questioned whether Plaintiff's relative had really died. Plaintiff offered to show Ms. Valentino pictures of her dead relative but Ms. Valentino declined the offer and told Plaintiff that she could take the rest of the day off since she was grieving. Plaintiff chose to remain at work.

71. Because of Plaintiff's failure to accommodate Plaintiff's disability by repairing the elevator, Plaintiff sustained spinal injuries from her first fall from the elevator on October 3, 2018, which were exacerbated by her fall on November 13, 2019. Plaintiff continues to undergo treatment for these injuries, including spinal ablations, which require general anesthesia.

## First Claim for Relief

### Discrimination Under the ADA and NYSHRL

72. Plaintiff realleges Paragraphs 1 through 71 of the complaint as if fully stated herein.

73. Plaintiff suffers from qualified disabilities in that she has Hereditary Spastic Quadriparesis which confines her to a wheelchair and chronic respiratory failure which requires her to use a ventilator.

74. Plaintiff was qualified for her position as a Licensed Master Social Worker and she has been employed as such since 2016.

75. Plaintiff experienced adverse employment actions including being relieved of her caseload without explanation, being forced to report breaks that she took to administer her medication, and being moved to an office that was further from the office entrance, further from the bathroom and further from the printer/copy room, and being subject to heightened scrutiny and criticism. Plaintiff was also terminated for a false, pretextual reason while she was recovering from an injury that occurred as a result of Seafield's failure to accommodate Plaintiff's disability.

76. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined by a jury.

## Second Claim for Relief

### Failure to Accommodate Under the ADA and the NYSHRL

77. Plaintiff realleges Paragraphs 1 through 76 of the complaint as if fully stated herein.

78. Plaintiff requested reasonable accommodations that would enable her perform her job more easily. Namely, Plaintiff requested on numerous occasions that Seafield repair the gap in the elevator in which Plaintiff's wheelchair would get stuck, and requested that her office not be moved further from the office entrance, bathroom and copy room.

79. Seafield failed to make these reasonable accommodations for Plaintiff, which directly led to Plaintiff suffering falls and severe physical injury.

80. By reason of the foregoing, Plaintiff has been damaged in amount to be determined by a jury.

### Third Claim for Relief
### Hostile Work Environment under the ADA and NYSHRL

81. Plaintiff realleges Paragraphs 1 through 80 of the complaint as if fully stated herein.

82. Plaintiff was subjected to a hostile work environment due her disabilities while employed by Seafield, in that, among other things, she was constantly harassed for using her phone to administer her medication, was humiliated by being forced to ask co-workers and patients to help her out of the elevator and was continuously accused of failing to make eye contact and sleeping and snoring during meetings.

83. By reason of the foregoing, Plaintiff was damaged in an amount to be determined by a jury.

## Fourth Claim for Relief

## Retaliation Under the ADA, NYSHRL and FMLA

84. Plaintiff realleges Paragraphs 1 through 83 of the complaint as if fully stated herein.

85. Plaintiff was retaliated against when she was terminated for pretextual reasons after complaining about Seafield's discrimination, harassment and failure to accommodate and immediately after she requested FMLA leave.

86. By reason of the foregoing Plaintiff was damaged in an amount to be determined by a jury.

WHEREFORE, Plaintiff demands a judgment against the Defendant as follows:

1. For an award of actual damages against Seafield for discrimination and retaliation against Plaintiff to be determined by a jury.

2. For an award of punitive damages against Seafield for discrimination and retaliation against Plaintiff to be determined by a jury.

3. For an award of compensatory/emotional damages against Seafield for discrimination and retaliation against Plaintiff to be determined by a jury.

4. For equitable and injunctive relief.

5. For attorney's fees and costs; and

6. For such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues in this action.

Dated: Lake Success, New York
April 28, 2020

        Yours, etc.

        VISHNICK MCGOVERN MILIZIO LLP

        _____
        By:    Avrohom Gefen
        3000 Marcus Avenue, Suite 1E9
        Lake Success, New York 11042
        (516) 437-4385
        agefen@vmmlegal.com